# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



THE ESTATE of STEPHEN FOSTER, through its )
administrator, Kozette Foster, DARNELL )
FOSTER, CARMELITA FOSTER, & )
SHERE FOSTER, )

                       Plaintiffs, )

VS. )

CITY OF CHICAGO, )
a municipal corporation and )
OFFICER C. HACKETT, # 7447 )
OFFICER T. GAFFNEY, # 19958 )
in their individual capacities, )
                    Defendants. )
)

JUDGE ANDERSEN

00C 3419

No.
   Jury Demand

MAGISTRATE JUDGE NOLAN

**DOCKETED**
**JUN 8 - 2000**

## COMPLAINT

## JURISDICTION

1. This action is brought pursuant to the Fourth, Fifth, Eight, Thirteenth and Fourteenth Amendments to the United States Constitution and pursuant to the laws of the United States, specifically 42 U.S.C. Section 1983, 1984, and 1985(3) to redress deprivations of civil rights of the plaintiffs accomplished by acts or omissions of the defendants committed under color of state law. Jurisdiction is invoked under 28 U.S.C. Section 1331 and 1343. The supplemental jurisdiction of this court is invoked for the prosecution of any state law claims.

-1-

## PARTIES

2. The plaintiffs, The Estate of STEPHEN FOSTER, and individually by DARNELL FOSTER, CARMELITA FOSTER, and SHERE FOSTER at all times material hereto, were citizens of the United States and permanent residents of Cook County, State of Illinois and the Northern District of Illinois.

3. The defendant CITY OF CHICAGO is a municipal corporation in the State of Illinois.

4. The defendant officers, C. HACKETT and T.. GAFFNEY, and other unknown Chicago police officers at all times material hereto, were and are duly appointed police officers of the Chicago Police Department and were acting in their individual capacities and under color of law. At all times material hereto, the defendants owed a duty of reasonable care to the plaintiffs in the performance of their duty, as well as a duty to prevent fellow officers from violating the civil rights of the plaintiffs.

## FACTS

5. On January 1, 1999, at or about midnight or shortly thereafter, certain known and unknown Chicago Police Officers heard gun shots at or near 1210 W. 52nd St, Chicago, Ill.

6. Said police officers, all Caucasian, including Officers C. Hackett and T. Gaffney, went up to the second floor apartment at 1210 W. 52nd St., Chicago, Illinois.

7. In the apartment were Stephen Foster, Darnell Foster, Carmelita Foster, Shere Foster and others adults and children. Said occupants had been shooting off firearms celebrating New years Eve.

8. None of the occupants had a weapon in their hand when the officers entered the apartment. Several officers, including defendants HACKETT and GAFFNEY grabbed Stephen Foster and

began striking him, knocking him to the floor and then kicking him, saying "you nigger mother f_____, I ought to kill you."

9. Foster was punched in the stomach. Foster cried out not to hit him, saying he was wearing a colostomy bag. The officer said: "Oh, you got a bag? So die motherf_____." Foster was then hit again in the stomach several times, then beat in the face, and again kicked.

10. Shere Foster rushed into the kitchen when hearing her father, Stephen, crying for help. She was pushed back by other officers, telling her: "You go back in there nigger, you got nothing to do with this."

11. One of the officers then punched Shere in the eye, saying: "That's what you get nigger."

12. At this point, an officer smashed the window in the screen door causing glass fragments to be strewn around the floor.

13. To try and prevent Shere from seeing what was happening to her father, Shere was knocked to the floor, then kicked twice in the ribs by an officer.

14. Carmelita Foster was told by Chicago Police Officers: "Bitch, get over there nigger, before we kick your ass." She was then punched in the face and stomach by an officer.

15. Stephen Darnell, Carmelita Foster and Shere Foster, were then all handcuffed and taken down to the alley and placed in a police wagon.

16. While in the wagon and while each was still handcuffed, Chicago Police Officers sprayed mace in the eyes, face of Stephen, Darnell, Carmelita and Shere.

17. Mace was sprayed on the cuts on Stephen Foster's eye, caused by the blows inflicted and on the cuts on Shere's legs, caused by the broken glass she was thrown onto.

18. During the time plaintiffs' were in the police wagon, a Chicago Police Officer said they

should kill the "niggers."

19. The Foster's were taken to the police station. Stephen Foster, bleeding from his eye and in obvious medical distress, was not taken immediately to the hospital, even after Carmelita and Shere called for help for their father while at the station.

20. Eventually, Stephen Foster was transported to Mercy Hospital where he was hospitalized for approximately two weeks. There Stephen Foster received four stitches to the eye and surgery was performed on the stomach to repair injuries to the colostomy site.

## COUNT I

(Sec. 1983 Excessive Force & Battery)

1 - 20. Plaintiffs incorporate paragraphs 1 through 20 as and for paragraphs 1 - 20 of Count I as though fully set forth herein.

21. On or about January 1, 1999, plaintiffs, STEPHEN FOSTER (by and through the Estate of Stephen Foster), DARNELL FOSTER, CARMELITA FOSTER and SHERE FOSTER were present at 1210 W. 52nd St., Chicago, Illinois, having been placed under arrest by certain of the defendant police officers.

22. At the time and date aforesaid, the plaintiffs did not use any force against any defendants or any other person and were not attempting to resist, escape or defeat arrest.

23. At the times and place aforesaid, the plaintiffs were taken into custody by one or more of the defendants.

24. That on the date and time aforesaid, and thereafter at the place of detention, Officers Hackett, Gaffney and other officers, were present and participated in the arrest of Stephen Foster,

-4-

Darnell Foster, Carmelita Foster and Shere Foster in their home of Stephen foster. That the defendant officers, have filed reports admitting their individual participation and roles in effecting the arrest of the plaintiffs.

At the time and place aforesaid, Stephen Foster was struck numerous times in the face, head and stomach with a weapon, and he also was kicked numerous times about the back, stomach and body while lying on the floor. Present on the porch were Officers Hackett, Gaffney, and other officers. Stephen Foster was then moved off the porch and placed in a police wagon, where mace was sprayed in his face. Later, at the police station, bleeding from the face and being in extreme pain and agony from the injury to his colon ostomy wound on his stomach, suffered from the blows by the weapon and kicks to the stomach, Stephen Foster was denied immediate medical care.

Shere Foster, while in the home, was punched in the eye and knocked to the floor, falling on broken glass from a glass door pane shattered by a police officer . While on her hands and bleeding knees, she was kicked several times in the ribs by another police officer. Carmelita Foster and Shere Foster were physically abused, threatened, pushed and dragged from the home by defendants and others; and were then placed in the police wagon with their father, Stephen Foster. All were previously handcuffed. At this time, defendants' sprayed mace into the faces of each of the plaintiffs and also onto the Shere Foster's bleeding leg wounds. Darnell Foster, after being maced while seated in the wagon, was then punched in the face by an officer.

25. That one or more of the defendants punched, slapped and beat the plaintiffs injuring them as hereinafter alleged.

26. That at no time was there probable cause to use force on the plaintiffs during the events

occurring on the date and time aforesaid. That in effecting the arrest and investigation of the plaintiffs, one or more of the defendant police officers used excessive force and violence against the person of the plaintiffs.

27. By the conduct alleged herein, the defendants deprived the plaintiffs of their right to be free from unreasonable searches and seizures and not to be deprived of their rights without due process of law as secured by the Fourth and Fourteenth Amendments to the United States Constitution.

28. Said acts, as alleged by the plaintiffs and set forth herein, were committed by the defendants willfully, intentionally and maliciously, without legal justification and for the sole purpose of depriving the plaintiffs of their constitutional rights under the law.

29. As a direct and proximate consequence of the conduct alleged herein, the plaintiffs suffered physical injury to their minds and bodies and incurred pain, suffering, disability and disfigurement and have incurred financial obligations for medical care and treatment. That the plaintiffs have suffered emotional trauma, anguish, humiliation and insult and that all of these losses and damages are reasonably certain to continue into the future.

WHEREFORE, plaintiffs pray for relief as follows:

A. Judgment for compensatory damages in favor of the plaintiff, Estate of Stephen Fosters against each of the defendants in the amount of TWO HUNDRED and FIFTY THOUSAND ($250,000.00) DOLLARS.

B. Judgment for compensatory damages in favor of the plaintiffs, Shere Foster, of Carmelita Foster and Darnell Foster against the defendants in the amount of TWENTY FIVE THOUSAND ($25,000.00) DOLLARS.

C. Judgment for punitive damages in favor of the plaintiffs and against each of the

defendants.

D. Reasonable attorneys' fees and costs.

E. Such other relief as this Court deems fit.

## COUNT II

(Sec. 1983 Failure To Prevent The Use Of Excessive Force)

1 - 29. Plaintiffs incorporate paragraphs 1 through 29 as and for paragraphs 1 - 29 of

Count II as though fully set forth herein.

30. That on or about January 1, 1999 while in custody of the defendants, one or more of the

defendants witnessed, observed or participated in the use of excessive force and battery against

the plaintiffs committed by one or more of the defendants or certain unknown Police Officers.

31. That on the date aforesaid, one or more of the defendants failed to restrain their fellow

officers from committing the described acts of excessive force, brutality and battery in their

presence despite the defendant police officers' sworn duty to enforce the laws of preserving peace

and protecting the plaintiffs.

32. That the defendants' failure and refusal to prevent the unprovoked assault and battery upon

the plaintiffs, deprived the plaintiffs' of their rights as secured under the Fourth and Fourteenth

Amendments to the United States Constitution, and caused injury as hereinbefore alleged.

WHEREFORE, plaintiffs pray for relief as follows:

A. Judgment for compensatory in favor of the plaintiffs against each of the

defendants in the amount of FIFTEEN THOUSAND ($15,000.00) DOLLARS.

B. Judgment for punitive damages in favor of the plaintiffs and against each of the

defendants.

C. Reasonable attorneys' fees and costs.

D. Such other relief as this Court deems fit.


## COUNT III

(Section 1985(3) Conspiracy)

1-32   Plaintiffs incorporate paragraphs 1 through 32 as and for paragraphs 1 - 32 of Count III of the Complaint.

33.   Plaintiffs, the Estate of Stephen Foster, (for Stephen Foster), Darnell Foster, Carmelita Foster and Shere Foster,  are Black citizens of the United States and residents of Cook County, Illinois.

34. The defendants, Hackett, Gaffney, and other unknown Chicago Police Officers, are white adults and members of the Chicago Police Department.

35. On January 1, 1999, the plaintiffs were in the home of Stephen Foster, in Chicago, Ill.

36. On that date, defendants willfully and maliciously conspired, planned and agreed to assault, beat, and injure the plaintiffs, in plaintiff's home and elsewhere, with their fists, feet, and weapons.

37. The Officer defendants (and other police officers) actions and  intent to injure the plaintiffs were motivated by racial and other invidiously discriminatory animus.

38. In so doing, the officer defendants, through such force and violence, deprived the plaintiffs of the equal protection of the law and from enjoying the equal rights, privileges and immunities of citizens under the laws of the United States, including, but not limited, to their rights to freedom of speech, movement, association and assembly; their rights to be secure in

−8−

their persons and their homes; and their rights not to be enslaved nor deprived of life and liberty other than by due process of law.

39. Pursuant to their conspiracy, the officer defendants and other unknown Chicago Police Officers entered into the home of Stephen Foster, ostensibly for the purpose of arresting plaintiffs for firing weapons on New years Eve.

40. Defendants (and other police officers), in an act of furtherance of the conspiracy, pointed firearms at the plaintiffs, knocked Stephen Foster to the floor, struck him in the eye with a deadly weapon, then kicked him numerous times; and uttered racial threats to kill and injure Stephen Foster, thereby terrorizing plaintiffs' to the utmost degree and depriving them of their safety.

41. Pursuant to their conspiracy, the officer defendants and other unknown Chicago Police Officers and knocked plaintiff Shere Foster to the floor and kicked her in the ribs.

42. Pursuant to their conspiracy, the officer defendants and other unknown Chicago Police Officers subdued the plaintiffs with excessive and unnecessary force, placed the plaintiffs in a police wagon, sprayed mace or other chemical agents in the eyes and over the bodies of each of the plaintiffs. Such actions were taken despite the fact that the plaintiffs were cuffed and seated in the wagon and of no danger or threat to the officers.

43. Pursuant to their conspiracy, one of the officer defendants or other unknown Chicago Police Officers punched Darnell Foster in the face adding to Darnell Foster's anguish and pain from the mace in his eyes.

44. Pursuant to their conspiracy, the officer defendants and other police officers, willfully, intentionally and maliciously menaced and assaulted each of the said plaintiffs by pointing firearms

-9-

and wielding deadly weapons, while uttering threats to kill and injure said plaintiffs, causing them to become stricken with fear of immediate injury and death and to suffer extreme terror, mental anguish, and emotional and physical distress.

45. Pursuant to and in furtherance of the officer defendants' conspiracy, Defendant Hackett , then willfully, intentionally, and maliciously clubbed Stephen Foster with the pistol on and about the face and stomach thereby severely injuring Stephen Foster.

46. Pursuant to and in furtherance of the officer defendants' conspiracy, defendant Gaffney and other unknown police officers, aided in this assault by striking Stephen Foster.

47. Pursuant to and in furtherance of the officer defendants' conspiracy, unnamed Chicago Police Officers assaulted the other plaintiffs with the explicit purpose of attempting to keep those other plaintiffs from witnessing the savage beating of Stephen Foster.

48. By their conspiracy and acts pursuant thereto, the officer defendants and other Chicago Police Officers, have willfully and maliciously, directly and indirectly, intimidated and prevented the plaintiffs from enjoying and exercising their rights, privileges and immunities as citizens of the United States and the State of Illinois, including, but not limited to their right not to be enslaved nor deprived of life, liberty or property without due process of law or equal protection of the law.

## COUNT IV

### (Section 1983 Conspiracy Claim)

1-48. Plaintiff incorporates paragraphs 1 through 48 of the Complaint by reference as paragraph 1 through 48  Count IV as though fully set forth herein.

49. That the defendants and each of them did conspire among themselves to deprive the plaintiff

of his constitutional rights, i.e., to hinder the due course of justice by engaging in a cover-up of the true circumstances of the plaintiff's arrest and beating at the hands of the defendants; and by engaging in a cover-up of the use of the excessive force used upon plaintiff as hereinafter alleged.

50. That an explicit or implicit "meeting of the minds" occurred among the defendants on January 1, 1999 and continuing thereafter in which an agreement was reached wherein the defendants did engage in one or more of the following overt acts to effectuate and promote the conspiracy:

a) agreed between themselves to falsify and did falsify official reports in which the defendants stated that Shere Foster obstructed a police officer, and that plaintiff, Stephen, resisted arrest and no notations entered that Stephen Foster had been injured when the defendants both knew that the plaintiff had been seriously injured as a result of the use of excessive force;

b) agreed between themselves to give and did give false testimony to the Chicago Police Department or City of Chicago Law Department during an investigation by stating that plaintiff resisted a police officer causing them to use force to knock the weapon from his hand, and that Shere Foster obstructed a police officer;

c) agreed between themselves to give and did give false testimony in the investigation and prosecution of the plaintiffs by stating that the plaintiff had not been the victim of excessive force;

d) agreed between themselves to give false testimony and did give false testimony in the investigation of the plaintiffs' injuries;

e) agreed between themselves to report and testify in judicial proceedings that the

plaintiffs had resisted or obstructed one or both defendants when in fact the plaintiffs never resisted or obstructed either defendant;

f) agreed between themselves to give false testimony in this action by testifying, inter alia, that the plaintiffs had resisted or obstructed with one or more defendants when in fact the plaintiffs did not commit these acts;

g) agreed between themselves to give false testimony about the extent of the plaintiffs' injuries and the source of these injuries;

h) agreed between themselves to give false testimony in this action relative to the cause of the plaintiffs' injuries and the extent of the plaintiffs' injuries;

i) agreed between themselves to give false testimony in the criminal prosecution of the plaintiffs by filing false criminal or quasi-criminal charges against the plaintiffs;

j) agreed between themselves to charge and did charge the plaintiffs with the criminal offense of resisting arrest and obstruction of a peace officer when in fact the plaintiffs did not commit said offenses nor was there probable cause to believe that the plaintiffs committed said offenses;

k) agreed between themselves to punch, and/or kick, and/or beat and spray mace on the faces and bodies of the plaintiffs and thereby use excessive force against them when the defendants knew that there was no necessity to strike, punch and/or kick or spray mace on the plaintiffs in order to subdue them;

l) agreed between themselves to falsify and did falsify official reports in which the defendants stated that the only force used upon the plaintiff had been used to subdue him when in fact the plaintiff, Stephen, had been punched and beaten while

-12-

on the floor and also after being handcuffed.

m) agreed between themselves to manufacture the criminal charges of resisting arrest and obstruction of a peace officer against plaintiffs after the arrest and filed said charges against the plaintiffs on January 1, 1999.

51. That the defendants' committed these overt acts as heretofore described with the joint objective of concealing the use of excessive force against the plaintiff, concealing the true circumstances of the plaintiff's injuries and depriving the plaintiff of his constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments by hindering the due course of justice by engaging in a coverup of the defendants' true involvement in the use of excessive force.

52. That it was also the joint objective and plan of the defendants from January 1, 1999 to the present to falsify reports and testimony and to charge and convict the plaintiffs with various criminal offenses to coverup and prevent the disclosure of the use of excessive force by the defendants against the plaintiffs.

53. That the explicit or implicit agreements of the defendants to coverup the use of excessive force as heretofore described were first made on January 1, 1999 and have continued and reoccurred to the present. That all of the overt acts and agreements heretofore described have been taken by the defendants with the express purpose of and mutual understanding to deprive the plaintiff of his constitutional rights.

54. Based upon information and belief the defendants have continued to discuss the false reports and false testimony between themselves since the date of this incident in an effort to present consistently false testimony in this action in order to deprive the plaintiff of his constitutional rights as aforesaid.

WHEREFORE, plaintiff prays for relief as follows:

A. Judgment for compensatory damages in favor of the plaintiffs and against each of the defendants in the amount of Fifty ($50,000.00) DOLLARS.

B. Judgment for punitive damages in favor of the plaintiff and against each of the defendants in the amount of TEN ($10,000.00) THOUSAND DOLLARS.

C. Reasonable attorneys' fees and costs.

D. Such other relief as this court deems fit.

## COUNT V

(Section 1983 - False arrest/ malicious prosecution)

1-54. Plaintiffs incorporates paragraphs 1 through 54 of Count IV as paragraphs 1 through 54 of Count V as though fully set forth herein.

55. That the defendants, Hackett and Gaffney, signed and otherwise caused certain criminal complaints to be executed against the plaintiffs', Stephen Foster and Shere Foster, charging them with various misdemeanor criminal offenses growing out of the arrest of the plaintiffs by the defendants.

56. That the misdemeanor criminal complaints against the plaintiffs were filed in the Circuit Court of Cook County.

57. That there was a termination of the charges of Resisting a Police Officer in favor of the plaintiff, Stephen Foster.

58. That there was a termination of the charges of Resisting a Police Officer in favor of the plaintiff, Shere Foster.

59. That there was an absence of probable cause in the institution and execution of said criminal

−14−

charges against these plaintiffs by the defendants as the plaintiffs did not commit any of the offenses charged nor was there any reasonable basis for the defendants to believe that the plaintiff had committed the criminal offenses with which they were charged.

60. That the execution, institution and prosecution of the charges against the plaintiffs by the defendants were committed and performed intentionally and with malice by the defendants.

61. That as a direct and proximate result of the false arrest and malicious prosecution of these criminal charges against the plaintiffs by the defendants the plaintiffs sustained damage and injury as aforesaid, were humiliated by said actions at their place of work, and was additionally forced to defend themselves from these spurious prosecutions.

WHEREFORE, plaintiffs, Estate of Stephen Foster and Shere Foster, pray judgment against the defendants as follows:

A. Compensatory damages in the amount of FIVE THOUSAND ($5,000.00) DOLLARS.

B. Punitive damages against each of the defendants in the amount of FIVE THOUSAND ($5,000.00) DOLLARS.

C. Reasonable attorney's fees and costs.

## COUNT VI
### [Monell Policy and Practice Claim]

1-61. Plaintiff incorporates paragraphs 1 through 61 of Count V as paragraphs 1 through 61 of Count VI as though fully set forth herein.

62. Said Constitutional violations and injuries to plaintiffs Stephen Foster (Estate of Stephen

Foster) Darnell Foster, Carmelita Foster and Shere Foster were directly and proximately caused by several interrelated policies, practices and customs of the City of Chicago, through its Police Department, Police Superintendent, the Office of professional Standards (O.P.S.) and Directors of the O.P.S

63. These policies, practices and customs of the defendant City and its Police Department and O.P.S. include, inter alia,

    a. the failure to properly train, supervise, discipline, transfer, counsel and otherwise control police officers engaged in the excessive use of force and other police abuse, particularly those, such as the defendants, who are repeatedly accused of said acts;

    b. the police code of silence; and

    c. falsely arresting, detaining, charging and/or prosecuting victims of brutality and other police misconduct and persons who exercise their right to observe and/or protest misconduct, inter alia, in an attempt to protect themselves and the Department from civil liability and themselves from internal discipline and/or criminal prosecution.

64. The policy of failure to discipline, supervise, counsel, transfer and control, is evidenced, inter alia, by the following:

    a. The fact that Police Department and Office of Professional Standards' own statistics state that for the 15 years prior to this incident, the O.P.S. has sustained excessive force complaints and recommended discipline in only 5% of the approximately 2,000 to 2,500 such complaints which are investigated by the OPS

each year. The vast majority of the remainder (75-82%) are classified "not sustained" (i.e.: "not enough evidence to either prove or disprove the allegation), despite the fact that many of these complaints, by the Department's and then Superintendent Martin's own admission, have merit. Superintendent Martin has further admitted that the OPS's failure to sustain meritorious complaints was, prior to the actions alleged herein, a serious problem within the department.

b.    An independent study by WMAQ T.V. and a 1989 police audit have both established that the actual sustained rate in excessive force complaints is actually even lower -- 1-2% per year.

c.    Police Command Personnel, the Superintendent and the Police Board, who review those relatively few cases which are "sustained" by the O.P.S., further substantially reduce the percentage of the sustained cases.

d.    In the few cases where sustained findings are made, the amount of discipline recommended and imposed, is, by the Superintendents's own admission, often grossly inadequate in light of the offense alleged, particularly when the officer is a "repeater," with multiple complaints and/or findings of "sustained."

e.    The Department itself, through its auditors and Command Personnel, has admitted, as recently 1990, that the sustained rate for excessive force complaints is too low, and that would be substantially higher if the O.P.S. properly investigated the complaints which it receives.

f.    In the vast majority of the cases where the OPS file and/or the court record demonstrates the use of excessive force, false arrest, imprisonment, malicious

−17−

prosecution, police cover-up, and/or other police misconduct, and which result in acquittals for the civilian victim in his or her criminal prosecution, and/or in verdicts or substantial settlements for the victims in a subsequent civil case, the OPS and the Police Department impose no discipline, almost never reopen the investigation after such a resolution, despite the existence of new evidence and/or judicial findings favorable to the victim, and sometimes promote the offending officer to a position of greater authority despite the resolution. In many of these cases, these offending officers are "repeaters" with numerous additional meritorious complaints of excessive force against them for which they were not disciplined.

g.   Additionally, on August 3, 1989, in <u>Wilson v. City of Chicago</u>, #86-C-2360, the jury found that the City had a policy and practice of abusing persons suspected of shooting police officers, and subsequently, the O.P.S. itself found that Command Personnel had participated in and condoned systematic police torture. However, the department has attempted to discredit these findings, and has disciplined no one for this extreme misconduct, with the exception of the pending proceedings against Commander Jon Burge, and Detectives Patrick O'Hara and John Yucaitis for the torture of Andrew Wilson.

h.   OPS investigators are, by the Department's own admission, inadequately trained; their investigations are grossly inadequate; they apply no cognizable standard of proof; and a substantial number of investigators are, or have been, connected with law enforcement, including applicants for jobs with the Chicago Police

Department.

i.  Moreover, the Department, the O.P.S. and the I.A.D., as a matter of practice and policy, accept a police officer's word over that of a victim in all "one on one" cases, and ignore the police code of silence and evidence that the officer is a "repeater" when conducting their investigations and in making their disciplinary findings and recommendations.

j.  The factors set forth in (h) and (I) further establish that numerous meritorious cases will be classified as "not sustained," with no discipline imposed.

k.  By the Department's and Superintendent's own admissions, the O.P.S. fails to recommend any discipline in at least 455 meritorious excessive force complaints per year. [20%-2% x 2500 complaints] In reality, the number of meritorious cases in which no discipline is imposed is no doubt much higher than the combined number alleged in this paragraph.

l.  Superintendent Martin has publicly conceded that 5% of Chicago police officers repeatedly use excessive force, yet in the vast majority of these cases no discipline is imposed on these repeater officers.

m.  The Department and OPS have identified these and other "repeaters", and established an "elite" repeater list of officers with at least ten excessive force complaints from June 1985 to May 1989, with five or more complaints from January 1988 to September 1991, with two or more complaints for 1989, and continue to compile similar repeater lists periodically to the present. These lists contain the names of 450-500 officers. From 1987 through 1991, nearly 25% of

the excessive force complaints received by the O.P.S. accused repeaters who were already the subject numerous prior complaints.

n.    The O.P.S. almost never [i.e.: approximately 1% of the time]  sustains excessive force complaints against these "repeaters", despite the similar and repeated nature of the complaints, the patterns of brutality and abuse revealed by them, and the Superintendent's, and his command personnel's, admitted recognition that the repeated, and similar nature of the complaints establish that many of the complaints against these repeaters are meritorious.

o.    Despite the fact that the department has recognized the existence of these repeaters and the repeated failure to discipline them to be a serious problem, and compiled detailed statistical information concerning the problem, the Department and the O.P.S. have done nothing to remedy this serious problem; said repeaters remain on the force and are permitted to remain on the streets, where they continue to have frequent contact with citizens, and accumulate additional complaints,  or have retired with a full pension.  Moreover, as set forth above and below, Department and the OPS practices and procedures protect said repeaters, who are sometimes promoted, and all too often given sensitive assignments such as the defendants and other repeaters were given herein, and are otherwise encouraged to continue their brutal conduct by their supervisors

p.    The Police Department previously had a general order which required that a "repeater" officer with three "sustained" or "not sustained" excessive force complaints within a two year period receive psychological counseling.  This order

was rescinded in 1983, and the vast majority of the repeaters since that time receive no professional counseling or psychological evaluation, and are not otherwise sufficiently monitored, controlled, or supervised.

q.    In 1983, WMAQ TV aired a series which identified and documented numerous police officers who were "repeaters" with up to 30 meritorious citizens' complaints of excessive force and other misconduct lodged against them, which complaints were rarely, if ever, sustained by the OPS.   On information and belief none of these officers or their supervisors have been disciplined, nor any investigation initiated, as a result of the information revealed in this study, and the officers so identified have continued on the force, and have subsequently engaged in additional acts of excessive use of force.

r.    The OPS and the Police Department destroy disciplinary files and records of all excessive force complaints, except those subject to litigation, after five years, and seek overly restrictive protective orders in civil and criminal cases where the disciplinary records are produced, making it more difficult to identify patterns of brutality, to identify and discipline police "repeaters", and therefore to adequately investigate complaints of excessive force

s.    Additionally, the overly aggressive, profane, and militarist training and supervision which the Department imparts to Chicago Police Department officers at the Training Academy and subsequently thereto, and the attitude imparted from the Command Personnel, from the Superintendent on down, as demonstrated by former Superintendent Martin's statements that the Chicago Police Department

was the "toughest gang in town," that certain constitutional rights should be curtailed, that the medieval tactics used in Chinese jails should be adopted here and that Hitler was successful in reducing crime, encourages, by former Deputy Superintendent Risley's own admission, systematic failure to train, discipline, supervise, and control, as well as promotes unnecessary and excessive use of force and related disrespect for citizens

t.  On October 2, 1997, columnist Eric Zorn of the Chicago Tribune cited the most recent statistics from OPS for the years 1993-1995 as a total of 8,620 claims of excessive force with only 707 sustained.

65. The policy, practice and custom of a police code of is evidenced, inter alia, by:

a.  The recent testimonial admissions of former Superintendent and the former and present chief Administrators of the David Fogel and Gayle Shines, that such a "code of silence" within the Police Department;

b.  The record, verdict and appellate decision in Jones v. City of Chicago, #83-C-2430 where a federal jury entered a verdict for $801,000 in compensatory and punitive damages against the City of Chicago, Police Department detectives, and police supervisory personnel for falsely arresting, imprisoning, and maliciously prosecuting the plaintiff and for maintaining a policy of suppressing exculpatory evidence from criminal defendants. This verdict was affirmed by the Seventh Circuit Court of Appeals, yet the only officer ever disciplined or investigated was Detective Frank Laverty, who broke the code of silence and exposed both the frame- up and the policy of suppressing exculpatory evidence

during plaintiff Jones' criminal trial. See <u>Jones v City of Chicago</u>, 856 F.2d 985, 991-2 (7th Cir. 1988)

c.       The testimony of numerous O.P.S. investigators and supervisors, as well as of Chief Administrator Gayle Shines, that in the thousands of O.P.S. excessive force investigations they have investigated and reviewed, that Chicago police officers never implicate themselves in such misconduct, and almost never make statements which implicate their fellow officers in brutality or related misconduct.

d.       The assertions of an anonymous police source, in <u>Wilson v. City of Chicago</u>, made in anonymous letters, that he was supplying information which implicated fellow officers in acts of brutality and torture anonymously because he feared retaliation by fellow officers and the police disciplinary system.

e.       Police Command Personnel, and other police officials, often make public statements in high profile excessive and deadly force cases, in which they exonerate the police officer before the investigation is complete. For example, former OPS Director Fogel made such statements in the Leonard Bannister and Stephen Hondras shooting cases, former Superintendent Martin made such a statement in the Moore case, and Superintendent Rodriguez made one in the Chlopek case.

f.       The O.P.S. investigation, testimony and record in <u>Falk v. McNamara</u> #88-C-7293 also establish this code of silence, <u>inter alia</u>, by showing how unidentified officers who participated in the infliction of excessive force are protected by the identified officers and other members of the department, by concealing their identities and

-23-

destroying documents which would place them at the scene, and how the Department and OPS fail to do the most basic and timely investigation when identification through documents and pictures could be accomplished.

g.  The findings of Chief Judge John F. Grady in United States v. Ambrose that "within the [Chicago Police] Department it is a fact and it was even admitted to from the witness stand that there is a code of silence and most policemen observe it." United States v. Ambrose, 740 F.2d 505 at 521 (7th Cir. 1984).

h.  Similar findings by Circuit Court Judge Patrick Morse, who has heard numerous criminal prosecutions where police brutality is alleged by the defendants, in People v. Hardeway and Hights, that, in his entire career, he had never before that case, ever heard an officer testify against another officer.

i.  Chicago Police Department Officer Donald McInerney's admission, under oath, as a prosecution witness in the criminal trial of brutality victim Michael Myatt that he would follow the code of silence and not testify against an officer who broke the law; [People v. Myatt, 89 MCI 328895, Br. 46, 4/5/90], Chicago Police Department Sgt. Bonds testimony that Chicago police officers are in a "fraternity," and that they would more summarily arrest a private citizen than they would a police officer if a criminal act was alleged, and Chicago Police Department officer Ruben Garza's statement that Chicago Police officers are "brothers" and that he would therefore never be disciplined by the department for his alleged misconduct.

j.  In Arana v Martin an experienced OPS investigator and an OPS supervisor

-24-

admitted to the existence of the code of silence both in name and in substance, and have admitted that in the thousands of excessive force cases they have investigated and reviewed, less than ten officers have testified against a fellow officer

k. The statement of civilian police employee, Mary Rapacki, at the September 29, 1989, City Council hearings on police brutality, that, in her experience, police officers cover up for each other and practice the code of silence.

66. The policy, practice, and custom of a police code of silence results in police officers refusing to report instances of police brutality and/or misconduct of which they are aware, despite their obligation under police regulations to do so, and also include police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges.

67. The fact that the aforementioned code of silence exists, and that its adverse impact is allowed to occur through the actions and inactions of high police officials including former Superintendent Martin, former O.P.S. Chief Administrator Fogel and present Chief Administrator Shines is also evidenced by the fact that while Martin, Fogel and Shines have acknowledged that they are aware of the existence of the custom and practice of a police code of silence, Fogel and Shines almost never recommended, and defendant Martin almost never approved discipline of officers charged with excessive force in instances where a civilian victim's version of an act of police misconduct is denied by an accused officer and that officer's partner, or where other police personnel do not contradict the accused officer's denial of the misconduct.

68. The aforementioned policy, practice and/or custom of a code of silence proximately caused injury to the plaintiff in this case, inter alia, because the police officers responsible for abusing,

brutalizing, arresting, detaining, and prosecuting plaintiffs had good reason to believe that their misconduct would not be revealed by fellow officers, that their denials would go unchallenged and that they were effectively immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct.

69. But for the belief that they would be so protected, the defendants would not have engaged in the conduct that resulted in the injuries to the plaintiff.

70. Additionally, the policy, practice and custom of falsely arresting, imprisoning, charging and/or prosecuting as set forth in above is evidenced by many specific cases and was also followed and implemented in this case with respect to the plaintiff and others who were falsely arrested and charged with mob action at the same time.

71. Said interrelated policies, practices and customs, as set forth above both individually and together, were maintained and implemented with deliberate indifference, and encouraged the defendants to commit the aforesaid acts against the plaintiff and therefore acted as a direct and proximate cause of said constitutional violations. Officers never admitted each others use of excessive force and in fact covered for each other in the reported complaints.

72. Additionally, said failure to properly discipline, control, supervise, transfer and counsel defendants despite past complaints also was done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to plaintiff.

WHEREFORE, each plaintiff, the ESTATE OF STEPHEN FOSTER, DARNELL FOSTER, SHERE FOSTER and CARMELITA FOSTER demand compensatory and actual damages of $100,000 from the defendant City of Chicago. Plaintiff also demands costs and attorneys fees and whatever additional relief this Court deems equitable and just.

-26-

Respectfully submitted,

Ronald A. Stearney

RONALD A STEARNEY
Attorney for Plaintiffs
180 N. La Salle Street
Suite 2500
Chicago, Illinois 60601
(312) 456-6900

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

The Estate of Stephen Foster, through its administrator, Kozette Foster, Darnell Foster, Carmelita Foster & Shere Foster

### JUDGE ANDERSEN

## DEFENDANTS

City of Chicago, a municipal corporation, and Officer C. Hackett, Officer T. Gaffney, in their individual capacities.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

### MAGISTRATE JUDGE

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **Cook**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

### 00C 3419

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Law Offices of Ronald Stearney & Ass.
180 N. LaSalle Street, SUite 2500
Chicago, Illinois 60601
312-456-6900

ATTORNEYS (IF KNOWN)

Ronald A. Stearney

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF (For Diversity Cases Only) AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY

☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury – Med. Malpractice
☐ 365 Personal Injury – Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS

☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☒ 440 Other Civil Rights

### PRISONER PETITIONS

☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY

☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY

☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS

☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY

☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS – Third Party 26 USC 7609

### OTHER STATUTES

☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

§1983, 1984, 1985

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☐ YES ☐ NO

## VIII. This case

☒ is not a refiling of a previously dismissed action.

☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

## JUDGE ANDERSEN

**In the Matter of**   Estate of Stephen Foster v. City of CHicago

**Case Number:**  00C 3419

MAGISTRATE JUDGE NOLAN

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

| (A) | (B) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** Ronald A. Stearney | **NAME** |
| **FIRM** Law Offices of Ronald Stearney | **FIRM** |
| **STREET ADDRESS** 180 N. LaSalle St., Suite 2500 | **STREET ADDRESS** |
| **CITY/STATE/ZIP** 312-456-6900 | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** 2711427 | **TELEPHONE NUMBER** |
| **IDENTIFICATION NUMBER  (SEE ITEM 4 ON REVERSE)** | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?**    YES ☒    NO ☐ | **MEMBER OF TRIAL BAR?**    YES ☐    NO ☐ |
| **TRIAL ATTORNEY?**    YES ☒    NO ☐ | **TRIAL ATTORNEY?**    YES ☐    NO ☐ |
|  | **DESIGNATED AS LOCAL COUNSEL?**    YES ☐    NO ☐ |
| (C) | (D) |
| **SIGNATURE** | **SIGNATURE** |
| **NAME** | **NAME** |
| **FIRM** | **FIRM** |
| **STREET ADDRESS** | **STREET ADDRESS** |
| **CITY/STATE/ZIP** | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** | **TELEPHONE NUMBER** |
| **IDENTIFICATION NUMBER  (SEE ITEM 4 ON REVERSE)** | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?**    YES ☐    NO ☐ | **MEMBER OF TRIAL BAR?**    YES ☐    NO ☐ |
| **TRIAL ATTORNEY?**    YES ☐    NO ☐ | **TRIAL ATTORNEY?**    YES ☐    NO ☐ |
| **DESIGNATED AS LOCAL COUNSEL?**    YES ☐    NO ☐ | **DESIGNATED AS LOCAL COUNSEL?**    YES ☐    NO ☐ |

DOCKETED
JUN 8 – 2000

**PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.**